**LAW OFFICE OF RACHEL S. BLUMENFELD PLLC**
26 Court Street, Suite 2220
Brooklyn, New York  11242
Telephone: (718) 858-9600
RACHEL BLUMENFELD

*Proposed Counsel to the Debtor*
*And Debtor-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | Chapter 11 |
| SHOWFIELDS, INC., | Case No.: 23-43643 (JMM) |
| Debtor. |  |

### DECLARATION OF TAL TZVI NATHANEL, PRESIDENT OF SHOWFIELDS, INC., IN SUPPORT OF DEBTOR'S CHAPTER 11 PETITION AND FIRST DAY MOTIONS

I, Tal Zvi Nathanel, pursuant to section 1746 of title 28 of the United States Code, hereby declare under penalty of perjury that the following is true to the best of my knowledge, information, and belief:

1.　　I am the CEO of Showfields, Inc., ("Showfields, Inc.") and Showfields NY 2 LLC ("Showfields Brooklyn") (collectively the "Debtors"), corporations organized under the laws of the state of Delaware.

2.　　On October 6, 2023 (the "Petition Date"), Showfields, Inc., filed a petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Eastern District of New York (the "Court"). On October 11, 2023, Showfields Brooklyn filed a petition for relief under Chapter 11 of

Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Eastern District of New York (the "Court").  The Debtors are a "small business debtor" as defined by section 101(51D) of the Bankruptcy Code and has elected to proceed under Subchapter V of Chapter 11 thereof.

## PRELIMINARY STATEMENT

3.     Since 2019 the Debtor Showfields, Inc., has owned and operated multiple brick and mortar lifestyle  retail sites that provide local vendors and artists (collectively, the "Members") physical space to showcase and sell their goods and products.  Specifically, the Debtor's retail sites offer a physical location to act as a platform for these Members, especially those that are generally relegated to selling products through online "e-commerce."

4.     The Debtor owns and operates the following retail locations:

    a.  Showfields NY 1, LLC ("ShowfieldsNY") (New York, New York)[1];

    b.  Showfields NY 2, LLC (Brooklyn, New York)[2];

    c.  Showfields FL 1, LLC (Miami, Florida)[3];

    d.  Showfields DC 1, LLC (Washington, D.C.)[4]; and

---

[1] Operations are closed, however the entity is still open.

[2] Operating and a Bankruptcy case has been filed for this entity.

[3] Operations are closed; entity is open and anticipated will be dissolved shortly.

[4] Operating.

e.  Showfields Magic Box, LLC (Los Angeles, California)[5] (collectively, and excluding Showfields Brooklyn, the "Non-Debtor stores").

5.  As of the Petition Date, the Debtors continues to manage its affairs as debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  As the Debtor is proceeding under Subchapter V of Chapter 11 of the Bankruptcy Code, an official committee of unsecured creditors will not be appointed in the Debtor's Chapter 11 cases (the "Chapter 11 Case") unless by Order of the Court.

6.  As with most commercial enterprises established almost immediately prior to and during the COVID-19 pandemic, the Debtor was plagued with lower than expected revenue streams from the Non-Debtor Stores due to low Member sales resulting from the national lockdown and gradual reopening of public spaces across the country.  As a result, and as described in further detail below, the Debtor Showfields Inc., entered into a loan agreement with the U.S. Small Business Administration (the "SBA").  Additionally, the Debtors entered into certain agreements with Merchant Cash Advance companies (the "MCA Companies") for the sale of the future receivables of some or all of the Non-Debtor Stores.

7.  Furthermore, the Debtor Showfields Inc., entered into an agreement with debt financing company Pipe Technologies, Inc. ("Pipe") whereby the Debtor sold its accounts receivable and recurring revenues to obtain operating capital for its businesses in the aggregate amount of $1,400,000.00.  Pipe filed a UCC-1 financing statement within the

---

[5] Operating; business expected to dissolve shortly.

State of New York seeking to secure its interests in all of the Debtor's accounts receivables.

8. As revenue continued to remain stagnant at the Non-Debtor Stores, the Debtor Showfields INc., became increasingly unable to satisfy its obligations to the SBA, Pipe, and the MCA Companies in a timely manner.

9. Finally, the Debtor is saddled with mounting obligations arising from deferred, and past due, lease payments owing under certain leases with the Non-Debtor Stores' as indicated on the below chart.

| **Entity** | **Location of Entity** | **Status of Operations** | **Landlord** | **Status of Lease** |
|---|---|---|---|---|
| Showfields Inc. | N/A | Operating | Landlord: *580 Broadway* * * * * * Vacated office end of August 2023. | Arrears of $53,463.00 |
| Showfields NY 1 LLC | Noho, New York | Closed (entity is still open) | Landlord: *350 Lafayette LP* * * * * * Vacated September 17, 2023. | Signed surrender agreement / termination fee. Showfields Inc. guaranteed termination fee of $150,000 to be paid by tenant / guaranteed by Showfields Inc. |
| Showfields NY 2 LLC | Brooklyn, New York | Operating | Landlord: *CW Realty Property Management* * * * * * Default | Disputed. Corporate good guy guarantee of 2 months provided by Showfields Inc. |

| Showfields FL 1 LLC | Miami, Florida | Closed (entity is still open) | Landlord: *530 Lincoln Owner LLC* * * * * * Vacated July 31, 2023. | Current with Landlord. Showfields Inc. provided a $2.5 million guarantee. LL would need to prove damages. |
|---|---|---|---|---|
| Showfields Magic Box LLC | Los Angeles, CA | Operating | Landlord: URW * * * * * Pop up. | Current / not in default. |
| Showfields DC 1 LLC | Washington, DC | Operating | Landlord: 3067 M Street, LP * * * * * | Current / not in default. |

10.

10.     As a result of these mounting pressures, the Debtor has determined that commencing the Chapter 11 Case is the most effective way to preserve and maximize the Debtor's value for the benefit of its creditors and stakeholders.

11.     The Debtor anticipates filing the following "first day" motions to be heard on an expedited basis (the "First Day motions"):

    a. *Debtor's Motion for an Order Authorizing the Payment of Prepetition Employee Wages, Benefits, Business Expenses and Related Relief* (the "Wage Motion");

    b. *Application Pursuant to Section 327(a) of the Bankruptcy Code for an Order Authorizing Employment and Retention of the Law Office of Rachel S. Blumenfeld PLLC as Attorneys for the Debtor Nunc Pro Tunc to the Petition Date* (the "Retention Motion");

    c. *Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing Use of Cash Collateral, (II) Granting Adequate Protection, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* (the "Cash Collateral Motion");

d. *Debtor's Motion for an Order Authorizing: (I) Continued Maintenance of Existing Bank Accounts; (II) Continued Use of Existing Business Forms; (III) Continued Use of Existing Cash Management System; (IV) Continued Intercompany Transactions; and (V) Waiver of Certain Guidelines Relating to Bank Accounts* (the "<u>Cash Management Motion</u>");

e. *Debtor's Motion for an Order (I) Authorizing the Debtor's to (A) Pay Obligations under Prepetition Insurance Policies, and (B) Renew, Supplement, Modify, or Purchase Insurance Coverage, and (II) Granting Related Relief* (the "<u>Insurance Motion</u>");

f. *Debtor's Application for Entry of an Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals* (the "<u>Compensation Motion</u>");

g. *Debtor's Motion for Entry of an Order Determining Adequate Assurance of Payment for Future Utility Services* (the "<u>Utilities Motion</u>"); and

h. *Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to Pay Prepetition Claims of Certain Critical Vendors and 503(b)(9) Claimants, and (II) Granting Related Relief* (the "<u>Critical Vendor Motion</u>").

## **BACKGROUND AND EVENTS LEADING TO CHAPTER 11 FILINGS**

### I.    **THE DEBTOR'S BUSINESS**.

#### a.  **The Debtor's Operations**.

12.    The Debtor Showfields Inc., was formed as a Delaware corporation in 2017 for the primary purpose of owning and managing boutique lifestyle retail sites offering space to local vendors and artists specializing in the creation and sale of wellness, design, and home goods.  The Debtor's primary mission includes highlighting these local artists and vendors in the communities in which the retail sites are located, and fostering a "back to in-person" approach to retail following the COVID-19 pandemic.   Since 2017, the

Debtor's portfolio has grown to the five (5) Non-Debtor Stores.  The Debtor is the sole member of each of the Non-Debtor stores.

13.    The Debtors and Non-Debtor Stores do not manufacture or sell products of their own.  Rather, the Non-Debtor Stores (including Showfields Brooklyn) lease(d) the real property upon which the retail sites are located and sell certain goods provided by the Members.  In return, Members pay a "membership fee" for use of the physical space to showcase and sell products to the general public.

14.    Specifically, the Non-Debtor Stores and Showfields Brooklyn provide their Members with a non-exclusive, revocable and non-transferable license to have their products presented in the retail locations.

15.    The Non-Debtor Stores and Showfields Brooklyn receive pre-approved goods and products from the Members, and the employees of the Non-Debtor Stores then showcase and sell such goods to customers at the physical retail sites.  A percentage of each sale of the Members' goods and products is retained by the Debtor, with the remainder paid to the Members.

16.    Furthermore, the Non-Debtor Stores and Showfields Brooklyn pay a management fee to Showfields, who, in turn, manages the administration and operation of the individual retail sites.

   **b.  Capital Structure.**

      **i.  *SBA Loan*.**

22.    On or about May 13, 2020, the Debtor Showfields Inc., executed and delivered to the SBA a promissory note  in the original principal amount of $150,000 (the "<u>Original</u>

Loan"). On March 22, 2020, the Debtor executed and delivered to the SBA a 1st Modification of Note (the "SBA Note"), under which the SBA agreed to increase the amount of the Original Loan from $150,000 to $500,000 (the "SBA Loan").

23.     Pursuant to the SBA Note, the Debtor Showfields Inc., is required to make monthly payments to the SBA in the amount of $2,514 per month until May 13, 2050.

24.     On March 22, 2022, the Debtor Showfields Inc., executed and delivered to the SBA an Amended Security Agreement (the "SBA Security Agreement") purportedly granting the SBA a security interest in all of the Debtor's personal property. However, the Debtor asserts that such security interest is not properly perfected, as the SBA filed a UCC-1 Financing Statement as to the collateral set forth in the SBA Security Agreement in New York rather than in the Debtor's state of incorporation, Delaware.

### ii. *Pipe Agreement*.

25.     The Debtor Showfields Inc., also entered into an agreement with Pipe, whereby the Debtor Showfields Inc., sold its accounts receivable and recurring revenues to obtain operating capital for its businesses in the aggregate amount of $1,400,000.00. Pipe filed a UCC-1 Financing Statement within the State of New York seeking to secure its interests in all of the Debtor's accounts receivables.

### iii. *MCA Debts*.

26.     Within the one (1) year preceding the Petition Date, the Debtor Showfields Inc., either individually or collectively with certain Non-Debtor Stores, entered into certain agreements (the "MCA Agreements") with MCA Companies[6] purportedly offering

---

[6] The SBA. Pipe, and the MCA Companies are collectively referred to herein as the "Lenders."

merchant cash advances for the Debtor's and Non-Debtor Stores' future receivables.  At the time, the Debtor considered the advances provided by the MCA Companies as necessary to continue to facilitate the continued operation and management of the Non-Debtor Stores' retail locations.

27.    As of the Petition Date, the Debtor is a party to MCA Agreements, either individually or collectively with certain Non-Debtor Stores, with the following MCA Companies: (i) AJ Equity Group LLC; (ii) Dynasty Capital 26 LLC; and (iii) Kalamata Capital Group LLC.   Under these MCA Agreements, the MCA Companies purportedly purchased approximately $941,400, in the Debtor's and certain Non-Debtor Stores' future receivables for the purchase price of approximately $690,000.

28.    Furthermore, the MCA Agreements allow the MCA Companies to make substantial automatic withdrawals form the Debtor's bank accounts  in satisfaction of the Debtor's obligations to the MCA Companies under the various agreements executed therewith.   These withdrawals are generally executed on a weekly basis, but some agreement require daily withdrawals.

**c.  The Debtor's Tax Liabilities.**

29.    Based on information and belief, the Debtor does not have any outstanding tax obligations as of the Petition Date.

## II.    <u>EVENTS LEADING TO CHAPTER 11</u>.

31.    The Debtor formed in 2017 in order to own and operate certain retail sites throughout the country.  Since that time, the Debtor's retail portfolio has grown to include the five (5) Non-Debtor Stores.

32.     The Non-Debtor Stores formed just prior to the commencement of the COVID-19 pandemic, with some forming and beginning operations just prior to the national shutdown affecting retail and other public spaces.

33.     The Debtor experienced economic difficulties almost immediately as a result of the COVID-19 pandemic resulting in the shutdown of a majority of retail locations and other public spaces on a national scale.   Consequently, the Non-Debtor Stores were no longer able to provide space for Members to showcase and provide goods and products for sale, resulting in significantly lower revenues than anticipated as well as significantly lower membership fees paid by the Members.

34.     As a result of these diminishing revenues and managing fees, the Debtor and Non-Debtor Stores were required to seek financing from additional sources, including the SBA, Pipe, and the MCA Companies in order to meet rising obligations to, among others, creditors, vendors, employees, and landlords.

35.     The gradual reopening of retail stores in the years following commencement of the COVID-19 pandemic was not accompanied by a concomitant increase in revenue at the Non-Debtor Stores.   As such, the Debtor was increasingly unable to satisfy its additional debt service   obligations to the SBA, Pipe, and the MCA Companies in a timely manner.

36.     Particularly detrimental were the Debtor's obligations under the MCA Agreements.   At the time, the Debtor considered the advances provided by the MCA Companies as necessary to continue to operate the Non-Debtor Stores; however, it eventually became clear that the fixed automatic withdrawals required by the MCA

Companies, sometimes on a daily basis, would further decimate the Debtor's financial condition.

37.    As Bloomberg News has reported, the merchant cash advance industry is "essentially payday lending for businesses," and "interest rates can exceed 500 percent a year, or 50 to 100 times higher than a bank's."[7]  This industry is a breeding ground for "brokers convicted of stock scams, insider trading, embezzlement, gambling, and dealing ecstasy."[8]  As one of these brokers admitted, the "industry is absolutely crazy. … There's lots of people who've been banned from brokerage.  There's no license you need to file for.  It's pretty much unregulated."[9]

38.    Many MCA Companies prey upon cash-strapped businesses that cannot readily obtain financing from banks and other traditional lenders.  Although they purport to represent the sale/purchase of a business's future revenue, the MCA Companies market, underwrite, and collect upon the transactions as loans, with interest rates far above those permissible under state law.

39.    Finally, most of the leases for the Non-Debtor Stores were negotiated and executed on pre-COVID terms that are currently unsustainable.  Indeed, the Showfields NY 1 LLC Lease was amended four (4) times in order defer certain lease payments coming due to the Showfields NY 1 LLC Landlord during the time that the COVID-19 pandemic was at its most critical.  Essentially, the Debtor and the Non-Debtor Stores are

---

[7] Zeke Faux and Dune Lawrence, *Is OnDeck Capital the Next Generation of Lender or Boiler Room?*, BLOOMBERG (Nov. 13, 2014, 6:07 AM), https://www.bloomberg.com/news/articles/2014-11-13/ondeck-ipo-shady-brokers-add-risk-in-high-interest-loans.

[8] *Id.*

[9] *Id.*

shouldering the burden created by the crushing obligations of, among other things, the Showfields NY 1 LLC Lease.

40.     The deferred lease payments subject to these amendments were apportioned to the remaining lease payments that would become due under the ShowfieldsvNY 1 LLC Lease until its expiration.

41.     In the face of these mounting, and at times insurmountable, obligations, the Debtor has determined that commencing this Chapter 11 Case is essential to preserve its assets and going concern value for the benefit of creditors, Members, vendors, landlords, and stakeholders.

### III.     **INITIAL MOTIONS**.

#### a.   **The Retention Motion.**

43.     The Debtor has determined that it will be necessary to engage counsel with knowledge and experience in the areas of bankruptcy and litigation.  Such legal counsel will enable the Debtor to fulfill its duties in this Chapter 11 Case and will assist in the reorganization of the Debtor's estate.  The Debtor proposes to retain the law firm of the Law Office of Rachel S. Blumenfeld PLLC ("RSB") as lead counsel in this Chapter 11 Case.

44.     The Debtor will seek authority to engage RSB as bankruptcy counsel because RSB has considerable experience in Chapter 11 reorganization cases.  In connection with services rendered prior to the Petition Date, including preparation for the commencement of this Chapter 11 Case, RSB has become familiar with the Debtor's circumstances and financial affairs.

45.     RSB has the necessary background to deal effectively with the many legal issues and problems that may arise in the context of the Debtor's Chapter 11 Case, and is well-qualified and uniquely able to represent the Debtor therein in an efficient and timely manner.

46.     For the foregoing reasons, and as more fully set forth in the *Application Pursuant to Section 327(a) of the Bankruptcy Code for Authorization to Retain the Law Office of Rachel S. Blumenfled PLLC  as Attorneys to the Debtor Nunc Pro Tunc to Petition Date* and the supporting Affidavit of Rachel S. Blumenfeld, Esq., filed with the application, the Debtor believes that the retention and employment of RSB in connection with this Chapter 11 case is in the best interests of the Debtor, its creditors, and all parties in interest, and should be approved in all respects.

**b.  The Cash Collateral Motion.**

47.     In the Cash Collateral Motion the Debtor seeks interim and final orders, which: (i) authorizes use of cash collateral of Pipe and the SBA; (ii) granting adequate protection to Pipe and the SBA; (iii) scheduling a final hearing; and (iv) granting related relief.

48.     The Debtor believes that all of its assets constitute cash collateral, the use of which requires either the consent of Pipe and/or the SBA, or an order of this Court.

49.     Specifically, the Debtor seeks an order granting Pipe and the SBA replacement liens on the Debtor's assets securing their respective claims.  Additionally, to the extent such replacement liens are insufficient to protect Pipe's and the SBA's interest in their collateral, the Debtor seeks an order granting such secured creditors' claims "superpriority" status in the Debtor's Chapter 11 Case pursuant to 11 U.S.C. § 507(b).

50.     The Debtor further proposes that the replacement liens and superpriority status granted to Pipe and the SBA be subordinated to certain claims of the Debtor's professionals, certain fees payable to a Chapter 7 Trustee and its professionals should the Chapter 11 Case be converted to case under Chapter 7 of the Bankruptcy Code, and fees payable to the Office of the United States Trustee and clerk of this Court.

51.     Absent authority to use the cash collateral of Pipe and the SBA, the Debtor would be entirely unable to continue business operations, which would have the immediate effect of the Debtor being wholly unable to satisfy its post-petition obligations, including those to its employees, landlords, vendors, and other parties in interest.

52.     Accordingly, the Debtor will be requesting that this Court enter and order approving the Cash Collateral Motion.

**c.  The Cash Management Motion.**

53.     The Debtor will be seeking an Order authorizing, but not directing: (i) continued maintenance of the Debtor's existing bank accounts; (ii) continued use of the Debtor's existing business forms; (iii) continued use of the Debtor's existing cash management system; (iv) continued intercompany transactions; and (v) a waiver of certain operating guidelines relating to bank accounts.  In addition, the Debtor's will be requesting that the Court schedule a final hearing in approximately 21 days after the commencement of this Chapter 11 Case, or as soon thereafter as is convenient for the Court, to consider approval of the Cash Management Motion on a final basis.

54.     In the ordinary course of business, the Debtor maintains a cash management system.  As of the Petition Date, the Debtor's cash management system is comprised of three (3) bank accounts located at Silicon Valley Bank (1) and Bank Leumi (2).

55.     As of the Petition Date, the Debtor Showfields Brooklyn has approximately $84,000.00 of cash on hand.

56.     In the ordinary course of business, the Debtor incurs periodic service charges and other fees in connection with maintaining its cash management system. The Debtor incurs a *de minimis* amount in bank fees each month under the cash management system. As of the Petition Date, the Debtor estimates that no prepetition amounts remain outstanding on account of bank fees.

57.     The Debtor maintains a multi-entity enterprise, and thus, routinely engages in intercompany financial transactions with other the Non-Debtor Stores, resulting in intercompany receivables and payables.  In the ordinary course of business, the Debtor makes intercompany transactions to either: (i) reimburse Non-Debtor Stores for various expenditures associated with their businesses; or (ii) fund certain Non-Debtor Stores' accounts in anticipation of such expenditures, as needed.

58.     The Debtor tracks all fund transfers through its accounting system and can ascertain, trace, and account for all intercompany transactions.  If such transactions were to be discontinued, the cash management system and the Debtor's operations, and that of the Non-Debtor Stores, would be disrupted unnecessarily to the detriment of creditors and other stakeholders.

59.     As part of the Debtor's cash management system, the Debtor utilizes a number of preprinted business forms in the ordinary course of its business, including, but not limited to, letterhead, purchase orders, invoices, and checks.  To minimize expenses to its estate and avoid confusion on the part of employees, customers, vendors, and suppliers during the pendency of this Chapter 11 Case, the Debtor requests that the Court authorize its continued use of all the Debtor's current preprinted business forms in existence immediately before the Petition Date, without reference to the Debtor's status as debtor-in-possession. The Debtor submits that once it has exhausted its existing stock of preprinted business forms, it shall ensure that any new business forms are clearly labeled "Debtor-in-Possession," and with respect to any business forms that exist or are generated electronically, the Debtor shall ensure that such electronic business forms are clearly labeled "Debtor in Possession."

60.     I believe that the relief requested in the Cash Management Motion is in the best interest of the Debtor's estate, its creditors, and all other parties in interest and will facilitate the Debtor's ability to operate its business in chapter 11 without disruption.

**d.  The Insurance Motion.**

61.     In the Insurance Motion, the Debtor will be seeking interim and final orders: (a) authorizing the Debtor to: (i) maintain the Debtor's insurance policies in the ordinary course of business on a postpetition basis consistent with past practice; (ii) pay any unpaid prepetition premiums associated with the insurance policies to the extent that such payment is necessary to avoid cancellation, default, alteration, assignment, attachment, lapse, or any form of impairment to the coverage, benefits or proceeds provided under the

insurance policies; (b) authorizing and directing financial institutions to receive, process, honor, and pay all related checks and electronic payment requests for payment of the insurance policies; and (c) granting related relief.

62.     The Debtor is the beneficiaries of various insurance policies administered by certain third-party insurance carriers.   Continuation and renewal of these policies and entry into new insurance policies, as applicable, are essential to the preservation of the value of the Debtor's properties and assets.   Moreover, in many instances, coverage provided by the Debtor's insurance policies is required by the regulations, laws, and contracts governing the Debtor's commercial activities, including the requirement of the Office of the United States Trustee that a debtor maintain adequate coverage given the circumstances of its chapter 11 case.

63.     Accordingly, the Debtor will be requesting authority to maintain its existing insurance policies, pay any prepetition obligations related thereto, and to renew, supplement, or enter into new policies in the ordinary course of business on a post-petition basis consistent with past practice.

64.     I believe that the relief requested in the Insurance Motion is in the best interest of the Debtor's estate, its creditors, and all other parties in interest and will facilitate the Debtor's ability to operate its business in chapter 11 without disruption.

### e.  The Wage Motion.

65.     The Debtor seeks an order: (i) authorizing, but not directing, the Debtor to pay prepetition wages, salaries and other employee benefits; (ii) authorizing, but not directing, the Debtor to continue maintaining employee benefit plans, including paying

prepetition costs associated with such plans; (iii) authorizing and directing all banks to honor prepetition checks for payment of prepetition employee obligations; and (iv) granting related relief.

66.     As of the Petition Date, the Debtor employs approximately 36 employees (26 for Showfields Inc., and 10 for Showfields NY 2 LLC) (the "Employees") to perform services in connection with the Debtor's operations, including approximately 32 full-time employees (26 for Showfields Inc., and 6 for Showfields NY 2 LLC) and 4 part-time employees, and 5 independent contractors.

67.     As of the Petition Date, the Debtor estimates that the total amount outstanding and owing to Employees on account of prepetition compensation is $210,000 (Showfields Inc, $90,000 Q2 commission $40,000 Q3 commissions Showfields NY 2 Inc $1,000; Showfields Inc., commissions for September $5,487.06 in expense reimbursement for Showfields NY 2 Inc.   The Debtor does not seek to make payments to any individual Employee on account of prepetition compensation in an amount in excess of the $15,150 statutory cap set forth in Bankruptcy Code section 507(a)(4) and 507(a)(5).

68.     Furthermore, in an abundance of caution, the Debtor seeks an order authorizing: (i) its continued withholding of certain amounts from Employee paychecks for, among other things, all required federal, state, and local taxes, Medicare, garnishments, and premiums for premiums for medical, dental and life insurance; and (ii) its continued remittance to the third parties to which these withheld amounts are required to be paid.

69.     Finally, the Debtor requests that this Court authorize continuance of the Debtor's benefits programs, including expense reimbursement, worker's compensation,

commission and incentive programs, paid time off, and health, dental, vision, life, and disability insurance.

70.     Without the continued, uninterrupted services of the Debtor's workforce, the ability of the Debtor to maintain and administer its estate will be materially impaired, and the Debtor's ongoing business could be severely and adversely affected.   The Debtor seeks to continue its applicable prepetition compensation and benefits programs in the ordinary course.

71.     As such, on behalf of the Debtor, I respectfully request that the Utilities Motion be approved.

  **f.   The Compensation Motion.**

72.     The Debtor will be seeking an order establishing procedures for interim compensation and reimbursement of professional expenses during this Chapter 11 Case.

73.     Specifically, the Debtor will request that this Court establish a mechanism whereby the Debtor's professionals, whether currently retained or retained during the pendency of this Chapter 11 Case, may request the payment of fees, and reimbursement of expenses, incurred by any such professional on a monthly basis.

74.     Furthermore, the Debtor will request that the Court establish procedures whereby any of the Debtor's creditors or other parties in interest may object to any request for monthly payment of fees or reimbursement of expenses made by the Debtor's professionals, and a method by which any such objection may be resolved.

75.     I believe that the relief requested in the Compensation Motion will not prejudice any creditor or party in interest and, therefore, request that the Court authorize such relief.

**g.  The Utilities Motion.**

76.     Through the Utility Motion, the Debtor will seek entry of interim and final Orders, among other things, (i) prohibiting the Debtor's utility providers from altering, refusing or discontinuing utility services on account of any prepetition amounts owed and outstanding for any utility services rendered, on account of the Debtor's bankruptcy filing or because of any perceived inadequacy of the Debtor's Proposed Adequate Assurance (as defined below); (ii) determining that the utility providers have received adequate assurance of payment for future utility services, as provided herein; (iii) approving procedures whereby the utility providers may request additional or different assurances beyond that proposed herein; and (iv) determining that the Debtor is not required to provide any additional assurance beyond the assurance set forth herein.

77.     The utility providers provide the Debtor with electricity, telecommunications, internet connectivity, water, waste disposal and other similar services.  The Debtor could not operate its business or serve in the absence of continuous utility services. Thus, any interruption in such services would disrupt the Debtor's day-to-day operations and be incredibly harmful to its business.

78.     In general, the Debtor has established a good payment history with the utility providers, making payments on a regular and timely basis. To provide adequate assurance to the utility providers, as required under section 366 of the Bankruptcy Code, the Debtor

proposes to deposit a in an amount equal to the average cost of one (1) month of utility service from that utility provider, calculated as an historical average over the past twelve (12) months, into a segregated account to be maintained during the pendency of the Chapter 11 Case (the "Adequate Assurance Procedures").

79.    I believe and am advised that the Adequate Assurance Procedures are necessary, because if such procedures were not approved, the Debtor could be forced to address numerous additional adequate assurance requests by the utility providers in a disorganized manner during the critical first weeks of the Chapter 11 Case.  Moreover, a utility provider could unilaterally determine, on or after the 30th day following the Petition Date, that it is not adequately assured of future payment and discontinuing service or making an exorbitant demand for payment to continue service.

80.    Accordingly, on behalf of the Debtor, I respectfully will be requesting that the Utilities Motion be approved.

**h.  The Critical Vendor Motion.**

81.    In the Critical Vendor motion, the Debtor will seek an order: (i) authorizing, but not directing, the Debtor to pay, in the ordinary course of business, prepetition amounts owing on account of: (a) critical vendor claims, in an amount not to exceed    for Showfield Inc.: $116,109.00 and (b) claims of 503(b)(9) claimants, in an amount not to exceed $96,053.25 (employees owed; no taxes); for Snowfield NY 2 LLC, $180,991.71 and (b) claims of 503(b)(9) claimants, in an amount not to exceed $16,048.72  (taxes; no employee wages) and (ii) granting related relief.

82.     In the ordinary course of business, the Debtor engages a number of providers for many of the critical administrative and financial services (*i.e.*, software, tax, and other similar services) that are essential to the continued operation of its business.    Of particular importance are critical vendors who are irreplaceable due to the specialized and unique services that they provide to the Debtor.

83.     The Debtor relies on these critical vendors to provide these services, which, in turn, allows the Debtor to operate its business uninterrupted and generate revenue for the benefit of the Debtor's creditors and stakeholders.    Furthermore, and equally as important, if not more so, these vendors also provide similar services to the Non-Debtor Stores.

84.     The Debtor's trade relationships with its critical vendors generally are not governed by long-term contracts, and, as noted, the Debtor believes that those relationships will materially deteriorate causing fatal disruption to the operations of not just the Debtor but the Non-Debtor stores as well if the Debtor is unable to pay the prepetition claims owing to these vendors.

85.     In addition, the Debtor may have received goods worth significant amounts from various vendors within the 20-day period immediately preceding the Petition Date, thereby giving rise to prepetition claims to the vendors enjoying priority status pursuant to Bankruptcy Code section 503(b)(9).

86.     As of the Petition Date, the Debtor believes it owes critical vendors for Showfields Inc: $107,609.00 clams subject to priority under Bankruptcy Code section

503(b)(9); and for Showfield NY 2 Inc., $203,829.12 in claim subject to priority under Bankruptcy Code section 503(b)(9).

87.    Failure to satisfy the claims of these various vendors and claimants under Bankruptcy Code section 503(b)(9) is likely to lead to disruption in the Debtor's business to the detriment of not only the Debtor, but to all parties in interest.   Therefore, I will respectfully request that this Court enter an order approving the critical vendor motion.

## IV.    <u>LOCAL RULE 1007-4 STATEMENTS</u>.

88.    The following statements are provided pursuant to Local Rule 1007-4:

89.    :

| L.B.R. 1007-4(a)(i): | See Sections I and II above. |
|---|---|
| L.B.R. 1007-4(a)(ii): | Not applicable. |
| L.B.R. 1007-4(a)(iii): | See Sections I and II above. |
| L.B.R. 1007-4(a)(iv) | Not applicable. |
| L.B.R. 1007-4(a)(v) | Not applicable. |
| L.B.R. 1007-4(a)(vi): | Official Form 204 filed with the Debtor's voluntary petition for relief under Chapter 11 provides the contact information for each of the holders of the 20 largest general unsecured claims. |

| | |
|---|---|
| L.B.R. 1007-4(a)(vii): | Schedule D filed subsequent to the Debtor's voluntary petition for relief under Chapter 11 will provide the contact information for each of the holders of the 5 largest secured claims. |
| L.B.R. 1007-4(a)(viii): | The Schedules and Statement of Financial Affairs filed subsequent to the Debtor's voluntary petition for relief under Chapter 11 will provide a summary of the Debtor's assets and liabilities. |
| L.B.R. 1007-4(a)(ix): | Not applicable. |
| L.B.R. 1007-4(a)(x): | Debtor's bank account was subject to being frozen pre-petition by AJ Equity. |
| L.B.R. 1007-4(a)(xi): | Not applicable. |
| L.B.R. 1007-4(a)(xii): | The Debtor's books and records are located at: Online and Eshel Aminov (CPA's)<br><br>The Debtor does not have any assets outside the territorial limits of the United States. |
| L.B.R. 1007-4(a)(xiii): | Part 3 of the Statement of Financial Affairs filed subsequent to Debtor's voluntary petition for relief under Chapter 11 will provide a list of pending actions against the Debtor or its property where a judgment against the debtor or a seizure of its property may be imminent. |
| L.B.R. 1007-4(a)(xiv): | **Tal Tzvi Nathanel - Co-Founder & CEO**<br>Director of Showfield Inc., Serial entrepreneur, and a seasoned founder of consumer product companies with over 15 years of experience. Have been with the company (debtor) since |

| | |
|---|---|
| L.B.R. 1007-4(a)(xv): | The estimated amount of the weekly payroll to employees for the thirty (30) day period following the filing of the Petition Date, calculated as a weekly average based on the anticipated total payroll for the thirty (30) day period is as follows: averaging approximately $22,912.56 for Showfields NY 2 net of taxes and fees $26,807.7 including estimated taxes fees and benefits. |
| L.B.R. 1007-4(a)(xvi): | Averaging and approximately $34,500 (gross monthly). |
| L.B.R. 1007-4(a)(xvii): | A schedule, for the thirty (30) day period following the Petition Date, of estimated cash receipts and disbursements, net cash gain or loss, obligations and receivables expected to accrue but remain unpaid, other than professional fees, and any other information relevant to an understanding of the foregoing will be set forth in the Budget filed as an exhibit to the proposed order attached to the Cash Collateral Motion.  Furthermore, the Debtor's schedules and statements that will be filed subsequent to the Petition Date will also include this information. |
| L.B.R. 1007-4 (a)(xviii) | The Debtor currently has insurance policy with Houston Specialty Insurance Co; StarStone National Insurance Company. |
| L.B.R. 1007-4 (a)(xix) | Schedule B filed subsequent to the Debtor's voluntary petition for relief under Chapter 11 will provide the debtor's bank account where the Debtor maintains its bank accounts. |

| L.B.R. 1007-4 (a)(xx) | See Sections I and II above. |
|---|---|
| | |

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed:        October 11, 2023                    By:___*Tal Zvi Nathanel*_____
                                                     Name:   Tal Zvi Nathanel
                                                     Title:    CEO, Showfields, Inc.